JOHN C. MATSON, Plaintiff and Respondent, v. NORTHERN HOTEL, INC., a corporation, and Western International Hotels, a corporation, Defendants and Appellants.

No. 11446.
Submitted Sept. 11, 1968.
Decided Nov. 14, 1968.
Rehearing Denied Dec. 3, 1968.
446 P.2d 913.

Crowley, Kilbourne, Haughey, Hanson, & Gallagher and Bruce R. Toole (argued), Billings, for appellants.

Berger, Anderson & Sinclair, Richard W. Anderson (argued), Billings, for respondent.

MR. JUSTICE CASTLES delivered the Opinion of the Court.

This is an appeal by the defendants from an order granting a new trial, after the district court had granted a judgment of non-suit at the close of plaintiff's evidence.

Plaintiff brought the action to recover for personal injuries received while attempting to operate a service elevator in the Northern Hotel in Billings. The accident occured March 29, 1967. Plaintiff, a professional entertainer, was hired by Humble Oil Company to entertain a company banquet in the Northern Hotel. Plaintiff was also a registered guest at the hotel.

After the banquet was over and the entertainment concluded, plaintiff sought to leave the area by means of the service elevator which is located in the back of the hotel building. This service elevator is just off the hallway leading from the banquet room to the second floor kitchen; it services the basement, first floor kitchen and second floor kitchen. Seventeen performers used the hallway as a storage, dressing area and waiting room between acts. Plaintiff stored his instruments, an accordion, trumpet and music weighing about 70 or 80 pounds, in the hallway a few feet from the service elevator door.

The hallway extends along the banquet room between the banquet room and the second floor kitchen. This hallway is used by waitresses and bus boys for delivery and preparation of food. Off the hallway there are several exits, the service elevator, a stairway and doors going into a corridor. This hallway was often used as "backstage" facilities, and the plaintiff had used it some six times previously.

Following the performance and banquet, where plaintiff was master of ceremonies as well as a musical entertainer, the hall-

way and elevator area was crowded with entertainers and their gear, Humble Oil employees, hotel personnel, and banquet guests.

Plaintiff testified he was hot, tired and perspiring. He was anxious to get to his room. The banquet room and corridors were crowded. He testified:

"Well, I went back here (indicating) and put my things away in their cases, and then I couldn't get out of that hallway, it was jammed with people, and the room, everybody got up and headed down and filled that lobby up so full, and these doors (indicating), this one included (indicating), were all crowded with 200, 300 people, maybe all 400 of them trying to get out at once. And several of them were in the back getting autographs. I just got kind of in a hurry and I wanted to get out of there.

"Q. So what did you say? What did you do? A. Well, I just said, 'I'm hot, been working hard. I'd sure like to get out of here."

" * * *

"A. Someone said, 'Why don't you take the freight elevator? You can get away from this crowd.' And I picked up my instruments. They said, 'Push the first-floor button. Close the doors, push the first-floor button.' I went inside, put my things in the back, came back to the front and I grabbed the ledge on the top of the door (illustrating) and pulled it down and I — I was perspiring, I was hot, and my right hand obviously slipped off the catch bar and it caught (illustrating) in the two doors when the the two doors met.

"Q. Now, this someone, Mr. Matson, can you identify them a little more specifically than that? A. Well, just like I said to Mr. Toole in my deposition, I cannot definitely say whether it was a bus boy or a waitress or someone back there. But somebody told me, someone that obviously knew what that service elevator was for. Otherwise I would have no reason to go to a service elevator, I—

"Q. Now, was the someone either a bus boy or a waitress? A. Like I said in the deposition, I can't be sure. I would assume the boys because they use it more.

"Q. Well, I know. But I say either a bus boy or a waitress. A. That's—

"Q. One or the other. A. I can't be sure. One or the other. Or someone there that knew what it was all about.

"Q. Did the same person tell you how to operate the elevator? A. Just said, 'Push the buttom, one.'

"Q. How about the doors? A. Well, close the doors, push the button to one.

"Q. Did that someone tell you how to close the doors? A. No.

"Q. Now, did you think you were going to be able to take that elevator to your room upstairs? A. No, I was taking it down to one. It's a kitchen elevator.

"Q. Were those your instructions, to take it down to one? A. Just said, 'Push number one.'

"Q. Did they tell you where it went? A. Well, I assumed the kitchen.

"Q. All right. Now, did you ever get a chance to actually operate the control panel on the elevator? A. No. No, the doors slammed on my hand and then I started yelling and I got the doors open and I got out of there and then people started gathering around me, our people and some of the other folks. They got an ice pack on me. I remember that vividly."

The elevator is what might be called "a large steel box," obviously not a passenger elevator, and as the plaintiff's previously quoted testimony indicates, he knew it to be what it was. The doors of the elevator move up and down, split horizontally in the middle.

The evidence further indicated that the upper door of the elevator was usually equipped with a strap which the operater of the elevator could use to pull down the door. The strap apparently was missing on the evening when the accident occurred. The plaintiff thinks the accident would not have

happened had the strap been there. There was no evidence showing when the strap came off before this particular accident, although there was testimony that the strap did wear and required replacement from time to time, and had been known to be off on previous occasions. A routine for reporting defects and repair thereof was described in the testimony which indicated that bus boys and other persons using the elevator were required to report defects. However, there was no proof that the hotel had any knowledge of any defective strap.

Further note should be made here concerning the operation of the elevator. When the upper door is pulled down by the strap or by the ledge provided for such purpose, the lower door rises simultaneously and the two lower doors come together. Hence, when plaintiff's hand slipped off the upper door, the lower door was proceeding upwards and his hand was caught between the descending upper door and the rising lower door.

Plaintiff was unable to identify the person who allegedly suggested that he use the service elevator. Plaintiff tried to establish the identity of such person by means of the deposition of Duane Swecker, who was the banquent manager at the Northern Hotel and who was at the scene of the accident shortly after it occurred. In his deposition, Swecker testified that 10 or 15 minutes following the accident and in the same general area as the accident John Matson told him or made a statement in his presence that a bus boy told him he could use the elevator. Objection was made to the introduction of this evidence, and that objection was sustained by the court. There was no further identification of the person issuing the so-called invitation, although there was, as quoted above, some speculation that it may have been a waitress or some other person in the employ of the hotel; or as plaintiff put it: "someone that knew what it was all about."

The issue on appeal is whether the trial court erred in granting the plaintiff's motion for a new trial. As appellants put it: the plaintiff had no business using this elevator except

to suit his own convenience. Accordingly, the plaintiff was a bare licensee when he entered the elevator and thus it would follow that mere passive negligence would not make the hotel liable.

On the other hand, respondent puts it that, insofar as a judgment of non-suit is concerned, the plaintiff's use of the elevator was a natural and foreseeable result of his status as revealed by the testimony and thus it was a jury question at least as to whether his status was as a business invitee within the immediate area of the elevator and as to whether he exceeded the actual or implied scope of his invitation.

The circumstances to be gleaned in the light most favorable to the plaintiff as against a motion for non-suit were: (a) no warning signs were posted anywhere restricting the service elevator or any part of the adjacent backstage area to hotel use; (b) plaintiff had never been cautioned against its use; (c) at the time of plaintiff's injury, the elevator was standing at the second floor with its doors *open;* (d) the more than 400 banquet guests were crowding into the main exits, and the backstage hallway was "jammed with people." It was in this setting that plaintiff remarked: "I'm hot, been working hard. I'd sure like to get out of here." And in the same setting, in response, a bus boy or waitress said: "Why don't you take the freight elevator? You can get away from this crowd * * * Push the first floor button. Close the doors, push the first-floor button." Plaintiff picked up his 70 or 80 pounds of equipment and walked into the open elevator.

The motion for new trial specified irregularity in the proceedings, error in law, and that the decision of the court in granting the nonsuit was against the law. No misconduct, no accident or surprise, no newly discovered evidence was asserted; simply that the court was wrong in its decision. The plaintiff had used extensive pre-trial procedures and produced all the evidence he had.

Both briefs make much of the status of the plaintiff; that

is—whether he was an "invitee" or a "licensee"; and thus whether the alleged negligence need be "active" or "passive." The question is interesting under the facts of this case, but we shall assume for our purposes that the plaintiff was an "invitee."

What negligence on the part of the hotel was proven? The only possible negligence was failure to provide a strap or to replace the strap. We have heretofore said that the strap was "apparently" missing. This would be the strongest inference in favor of the plaintiff. It must be remembered that this is a service elevator, known to the plaintiff as such; known so well that he testified, "Otherwise I would have no reason to go to a service elevator." While there was some proof that the strap was an article that would wear and require replacement, evidence was lacking that there was any negligence in inspection or in reporting a defective condition at that particular place, because only employees and service people used it.

The plaintiff argues that the defect was self-created; that is of the defendant hotel's own making. Thus, from this, that knowledge is inferred. Plaintiff cites Robinson v. F. W. Woolworth Co., 80 Mont. 431, 261 P.253. In that case it was said: "When a party intentionally creates a condition, he is held to have knowledge of it, and notice is not necessary."

But, to infer notice of the missing strap, if it was missing, on a service elevator not generally used by other than employees to the hotel does not seem reasonable. Here, plaintiff makes much of the suggestion of a waitress or bus boy that plaintiff make his exit via the service elevator; but again no satisfactory identification is made.

The general rule is that a proprietor of premises may not be held liable for injuries resulting from a defect in the premises, if such defect was not caused or placed on the premises by the proprietor, but was of such a character as to come about without his knowledge. See Clark v. Worrall, 146 Mont.

374, 406 P.2d 822; Rossberg v. Montgomery Ward & Co., 110 Mont. 154, 99 P.2d 979.

Certainly the missing strap would likely come about without the proprietor's knowledge, and there is simply no evidence of a failure to inspect.

We find here, then that there was a failure of proof of the want of ordinary care on the part of the hotel. This being so, the motion for judgement of nonsuit was properly granted and the subsequent order granting a new trial was in error.

Accordingly, the order granting a new trial is reversed and the matter returned to the district court for entry of judgment of nonsuit. It is so ordered.

MR. CHIEF JUSTICE JAMES T. HARRISON, MR. JUSTICES HASWELL, ADAIR and JOHN C. HARRISON, concur.